IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| KENDRELL DANIELY,<br><br>    *Plaintiff,*<br><br>v.<br><br>Deputy NICHOLAS DENNY,<br><br>    *Defendant*. | CIVIL ACTION NO.<br>**5:24-cv-00306-TES** |

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Believing himself to be the target of malicious prosecution, Plaintiff Kendrell

Daniely brought claims under 28 U.S.C. § 1983 against Defendant Nicholas Denny and

Sheriff David Davis. [Doc. 1]. The Court dismissed Plaintiff's claims against Sheriff

Davis, leaving just Defendant Denny (hereinafter "Defendant"). [Doc. 21]. Defendant

then filed a Motion for Summary Judgment, which is ripe for the Court's review.

### A.    FACTUAL BACKGROUND[1]

In 2011, Defendant began working at the Bibb County Sheriff's Office as a

corrections officer. [Doc. 26-2, ¶ 1]. A few years later, he completed his Peace Officer

Standards & Training ("POST") to become a peace officer. [*Id.* at ¶ 2]. In 2020 or 2021—

around 10 years after he started working as a corrections officer—Defendant was

---

[1] Unless otherwise cited, the following facts come from Defendants' Statement of Undisputed Material Facts [Doc. 26-2] and are undisputed by Plaintiff. *See* [Doc. 34-1].

assigned to the Gang Unit. [*Id.*]. He remained in the Gang Unit until the Sheriff terminated him in October of 2024. [*Id.*].

Plaintiff Daniely got a job as a corrections officer at the Bibb County Law Enforcement Center ("BLEC") in 2021. [Daniely Depo., p. 29:10–21]; [Doc. 26-2, ¶ 6]. Almost two years later, Plaintiff applied for a job with the Henry County Police Department ("HCPD"). [Daniely Depo., p. 32:1–4]. He started with the HCPD in March of 2023. [*Id.* at p. 32: 5–7]. As part of the onboarding process for the HCPD, Plaintiff went to a police training facility in Forsyth, Georgia for training that was supposed to last 12 weeks. [*Id.* at pp. 30:11–33:2]. Defendant arrested Plaintiff approximately five weeks into the training. [*Id.* at p. 33:3–6].

Plaintiff's arrest resulted from an investigation that started with prison contraband. In 2022, the BLEC recovered a contraband cell phone. [Doc. 26-2, ¶ 4]. That phone belonged to an inmate named Kaylen Johnson who was also a high-ranking member of the Macon Mafia gang. [*Id.*]; [Daniely Depo., pp. 45:24–46:1]. Eventually, Jada Anderson, Kaylen Johnson's sister, was arrested for bringing in the cellphone, but law enforcement suspected she had help from someone who worked in the BLEC. [Doc. 26-2, ¶ 5]. During the investigation of the cellphone, law enforcement discovered messages between Jada Anderson and Plaintiff. [*Id.* at ¶ 7]. As a result, correctional officers asked Plaintiff to come in for an interview about the investigation. [Doc. 28-1, ¶ 5]. Plaintiff did not know they were calling him in for an interview. [Daniely Depo., p.

41:12–18].

Defendant and Lieutenant Batchelor conducted the interview. [*Id.* at pp. 39:8–14, 39:10–14]; [Doc. 26-2, ¶ 9]. During the interview, Plaintiff denied any wrongdoing. [Doc. 26-2, ¶ 10]. But, he stated that he had received some messages on Facebook from the family members of inmates. [Daniely Depo., p. 43:16–23]. He changed his Facebook name to "Mansa Musa," but that didn't stop people from finding his page. [*Id.* at pp. 43:6–45:9]; [Doc. 26-2, ¶ 11]. One of those family members was Jada Anderson, the sister of Kaylen Johnson, the inmate with the cellphone. [Daniely Depo. pp. 44:1–45:25]. She flirted with Plaintiff and asked to meet up in person. [*Id.* at pp. 44:22–46:15]. Plaintiff never responded to Jada's requests to meet up and deleted her messages because he had a girlfriend at the time. [*Id.* at pp. 46:11–12; 95:1–8]; [Doc. 26-2, ¶ 11]. At some point during their communication, Plaintiff reported Jada Anderson to his supervisors, but he did not tell them that Kaylen Johnson was trying to communicate with him through her. [Doc. 26-2, ¶ 12]; [Daniely Depo. 47:20–25].

During the interview, Plaintiff allowed Defendant to search his phone. [Doc. 26-2, ¶ 18]. There, Defendant found a contact labeled "4KG Ray" in Cash App. [Doc. 28-1, ¶ 7]; [Daniely Depo., p. 78:16–25]. "4KG Ray" is Plaintiff's brother. [Daniely Depo., p. 79:1–4]. Plaintiff's brother's legal name is Rayshon Bennett, but he also goes by—at least, as it relates to this case—RJ, LA Ray, 4KG Ray, and Jayshawn Daniely. [Doc. 26-2, ¶ 37]; [Daniely Depo., pp. 53:8–54:24]. Rayshon Bennett is Plaintiff's only brother.

[Daniely Depo., p. 57:20–23].

"4KG" is a sect of the Crip gang that started when a teenager named Kendrick Davis (the "KG" of "4KG") was killed in a drive-by shooting. [Wilson Depo., p. 25:22–23]; [Doc. 28-1, ¶ 7]. When asked about his brother and 4KG during the interview, Plaintiff said his brother "knew the boy." [Doc. 26-2, ¶ 22]. Plaintiff told Defendant and Lieutenant Bachelor that they needed to get "schooled up" on how the gangs relate to each other because it has more to do with what neighborhood someone is from than gang affiliation. [*Id.* at ¶ 25]. When asked what else Plaintiff knew about gangs, he said that 4KG was related to a group called "TDK," but said he did not know what TDK was. [*Id.* at ¶ 28]. Some of Plaintiff's family members are in gangs, but he denied knowing who they are. [*Id.* at ¶ 30]; [Daniely Depo., pp. 88:13–89:21].

Prior to Plaintiff's interview, his brother borrowed Plaintiff's car to sneak around with a girl. [Doc. 26-2, ¶¶ 13, 14]. When dropping the girl off, someone shot out the windows of Plaintiff's car. [*Id.* at ¶ 15]. Plaintiff found this story about his car suspicious, but Plaintiff said his brother was not one of those family members in a gang. [*Id.* at ¶¶ 16, 30 n.4].

After his interview with Plaintiff, Defendant swore out a search warrant for Plaintiff's Facebook account. [*Id.* at ¶ 32]. Defendant found messages between Plaintiff and "LA Ray"—Plaintiff's brother—which stated, in relevant part:

> LA Ray on Jan. 26, 2022: Cj said can you run a tag or sum
> LA Ray on Jan. 26, 2022: I meant a plate or sum

4

. . .
LA Ray on Feb. 19, 2022: You still got the rod ?
LA Ray on Feb. 23, 2022: A fam ?
Plaintiff on Feb. 23, 2022: Ya
LA Ray on Feb. 23, 2022: NVM
Plaintiff on Feb. 23, 2022: [sticker png attachment]
Plaintiff on Feb. 23, 2022: Wassup
LA Ray on Feb. 23, 2022: Naw I was finna ask you too put dis rod in yo name for me
Plaintiff on Feb. 23, 2022: You got the money
LA Ray on Feb. 23, 2022: Yeahh
Plaintiff on Feb. 23, 2022: Do it tomorrow
LA Ray on Feb. 23, 2022: Ight

. . .
LA Ray on April 30, 2022: Take da rod too my ma house in da morning

[Plaintiff missed a call from LA Ray later that day]

LA Ray on April 30, 2022: Wea it at

[*Id.* at ¶ 36]; [Doc. 30-1, pp. 267–268]. A "rod"[2] is a common slang term used for a gun. [Daniely Depo., p. 57:15–19]; [Wilson Depo., p. 30:20–23]. Plaintiff did purchase a gun—but claims he did so for himself—and stored it at his house in a lock box. [Daniely Depo., pp. 56:13–57:3, 69:12–25]. There was a period of time when he stored it at his mother's house when he and his then-girlfriend went through a short breakup. [*Id.* at p. 69:12–25]. No one else had the combination to the lock box. [*Id.* at p. 70:14–15].

Upon completion of this investigation, Defendant and the Macon-Bibb County District Attorney's Office submitted affidavits for arrest warrants for Plaintiff for violation of oath of public office and criminal street gang activity. [Doc. 26-2, ¶ 39].

---

[2] Of note, during this time Plaintiff gave his brother rides to work around twice per week. [Daniely Depo., p. 60:5–15].

Defendant's sworn affidavit stated:

> The accused KenDrell [sic] Daniely did commit the offense of Violation of Oath by a Public Officer when he being a sworn Employee of the Bibb County Sheriff Office located at 668 Oglethorpe St in Macon, Georgia did knowingly provide a "rod" in which this Investigator knows to be a rifle, to Jayshawn Daniely. By the admission from Daniely from a prior interview, he stated his brothers were FourKG Crip. This Investigator knows FourKG Crip to be a Violent Hybrid Crip Street Gang in Macon Georgia. In doing so Daniely directly violated his signed Oath of Office and clearly displayed he was an Associate of the Criminal Organization FourKG Crip. All of the above information was discovered through a Social Media Search Warrant obtained and reviewed on the 20th day of December 2022. and this deponent makes this affidavit that a warrant issue for his (her) arrest.

[Doc. 34-4, p. 83]; *see also* [Doc. 24-4, p. 85].

On April 24, 2023, Defendant arrested Plaintiff during his POST training in Forsyth, Georgia. [Doc. 26-2, ¶ 42]; [Doc. 28-1, ¶ 13]. Plaintiff posted bond one month later. [Doc. 26-2, ¶ 45]. Because of the arrest, Henry County Sheriff's Office fired Plaintiff. [*Id.* at ¶ 44]. After the arrest, Defendant drafted a supplemental report about the evidence against Plaintiff. [*Id.* at ¶ 43]. He then testified before the grand jury on October 3, 2023. [*Id.* at ¶ 46]. The grand jury indicted Plaintiff the same day. [*Id.* at ¶ 48]. In their indictment, they alleged that Plaintiff "knowingly provide[d] a firearm to Rashon Bennett, a person who the accused knew to be a gang member of FourKG Crip . . . ." [Doc. 24-4, p. 86].

Defendant suggested a plea deal for Plaintiff, and told ADA Taylor Wilson that he didn't want Plaintiff to be an officer anymore. [Doc. 26-2, ¶ 49]; [Daniely Depo., pp.

26:24–27:5]. After the District Attorney's ("DA") office asked for the footage of the interview several times, Defendant finally turned it over. [Doc. 26-2, ¶ 49]; [Howard Depo., p. 77:5–9]. The DA's office reviewed the footage and realized that it did not support Defendant's statements in his affidavit. [Wilson Depo., pp. 31:13–32:19]; *see also* [Doc. 28-1, ¶ 14 ("my 2023 report, which incorrectly stated that Kendrell Daniely 'admitted' his brother was 4KG Crip.")]. The DA's office then dismissed the case against Plaintiff. [Howard Depo., p. 77:1–18]; [Doc. 34-5, p. 111]. Lieutenant Batchelor also investigated Defendant's actions and concluded that Defendant's affidavit included a false statement. [Doc. 26-2, ¶ 53]. After the case against Plaintiff had been dismissed, District Attorney Anita Howard sent Sheriff Davis a letter, stating that, among other things, "our Office can no longer rely on information provided by [Defendant] and cannot prosecute any cases that rely solely on his testimony." [Doc. 24-5, p. 110]. One month later, Plaintiff filed this lawsuit. [Doc. 1].

### B.   LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991));

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[3] "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d

---

[3] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2); *see also* n.1, *supra*. However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

"[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The nonmovant's evidence is to be believed, and "all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]f a reasonable jury

9

could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment." *Sconiers*, 946 F.3d at 1263.

### C. DISCUSSION

Easy stuff first. Plaintiff requests that his state law claims against Defendant be dismissed. [Doc. 34, p. 18]. Accordingly, the Court **DISMISSES** Plaintiff's state law claims: Counts One (malicious prosecution under O.C.G.A. § 51-7-40), Two (punitive damages under O.C.G.A. § 51-12-5.1(b)), and Three (attorney's fees under O.C.G.A. § 13-6-11).

Plaintiff brings his remaining federal claim against Defendant under 42 U.S.C. § 1983 for malicious prosecution. [Doc. 1, at pp. 9, 11]. To state a claim for Fourth Amendment malicious prosecution in the Eleventh Circuit, a plaintiff must show: "(1) the plaintiff was seized under legal process; (2) the legal process justifying the plaintiff's seizure was constitutionally infirm; (3) the suit or proceeding terminated in the plaintiff's favor; and (4) the seizure would not otherwise be justified without legal process." *Gervin v. Florence*, 139 F.4th 1236, 1238 (11th Cir. 2025) (citing *Butler v. Smith*, 85 F.4th 1102, 1111–12 (11th Cir. 2023)); *see also Mathis v. Eslinger*, No. 20-13761, 2022 WL 16841924, at *8 (11th Cir. Nov. 10, 2022). Defendant only contests the constitutional firmness of the legal process justifying Plaintiff's seizure. [Doc. 26-1, p. 10]; [Doc. 34, p. 12].

10

In his Motion for Summary Judgment, Defendant attempts to avoid liability for his actions by invoking qualified immunity. [Doc. 26-1, p. 9]. Qualified immunity "shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established statutory or constitutional rights that a reasonable person would have known about." *Huggins v. Sch. Dist. of Manatee Cnty.*, 151 F.4th 1268, 1278 (11th Cir. 2025) (citing *Baker v. City of Madison*, 67 F.4th 1268, 1278 (11th Cir. 2023)). The analysis for qualified immunity involves burden-shifting. *Edwards v. Grubbs*, No. 24-12787, 2026 WL 706637, at *4 (11th Cir. Mar. 13, 2026). "To be eligible for qualified immunity, a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Id.* In other words, he must have "acted (1) in accordance with [his] job-related duties, and (2) within the scope of his authority." *Huggins*, 151 F.4th at 1278 (quoting *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021)). If the government official makes this showing, the plaintiff must then show "(1) a violation of a constitutional right (2) that was clearly established at the time of [Defendant]'s alleged misconduct." *Edwards*, 2026 WL 706637, at *4 (quoting *Underwood v. City of Bessemer*, 11 F.4th 1317, 1328 (11th Cir. 2021)). Plaintiff must satisfy both prongs to overcome qualified immunity. *Id.*

Defendant clearly acted within the scope of his discretionary authority here when he conducted an investigation and submitted an affidavit for an arrest warrant. Under Georgia law, the "decision to seek an arrest warrant is a discretionary act."

*Anderson v. Cobb*, 573 S.E.2d 417, 419 (Ga. Ct. App. 2002); *see also Stephens v. Zimmerman*, 774 S.E.2d 811, 816 (2015) (stating that an officer acted within discretionary authority "in investigating and obtaining arrest warrants") (citing *Anderson*, 573 S.E.2d at 419); *Turner v. Floyd Med. Ctr.*, 4:20-cv-201-MLB, 2022 WL 1443390, at *4 (N.D. Ga. May 6, 2022) (stating that an officer's judgment to obtain a warrant was discretionary) (citing *Anderson*, 573 S.E.2d at 419).

With Defendant's burden satisfied, the burden now shifts to Plaintiff to show that Defendant violated a statutory or constitutional right that was clearly established at that time.[4] "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Edwards*, 2026 WL 706637, at *4 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). For qualified immunity, a right may be clearly established in one of three ways:

> (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

---

[4] In his Motion for Summary Judgment, Defendant cited to *Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324 (11th Cir. 2024). Indeed, *Sylvester* is directly on point for the circumstances of this case. However, when dealing with qualified immunity questions, the constitutional right must have been clearly established at the time of the violation. *Sylvester*, 94 F.4th at 1330; *Mathis*, 2022 WL 16849124, at *8. *Sylvester* says that "any officer who intentionally or recklessly submits an affidavit plagued by material misstatements or omissions violates clearly established law," but Sylvester is a 2024 case. The events giving rise to this lawsuit occurred in 2023. That, unfortunately, excludes *Sylvester* and its simplified language from a clearly established analysis.

12

*Id.* at \*7 (quoting *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025)).

As stated above, Plaintiff argues that Defendant "violated his clearly established right to be free from an unreasonable seizure resulting from malicious prosecution" when he, "through intentionally false statements, manufactured evidence to secure the arrest and prosecution of Defendant Denny," and "intentionally or recklessly made misstatements or omissions necessary to support the warrants that justified [Plaintiff's] seizure." *Mathis*, 2022 WL 16849124, at \*8; [Doc. 1, ¶¶ 51–52]. The Eleventh Circuit clearly established this constitutional right—to be free from intentional false statements in arrest warrants, and likely also reckless false statements—well before Plaintiff's arrest. *See Williams v. Aguirre*, 965 F.3d 1147, 1169 (11th Cir. 2020) ("we readily conclude that every reasonable official would interpret our precedents to establish that intentional, material misstatements in warrant applications violate the Constitution.") (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (alterations accepted); *Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994) (applying the United States Supreme Court's probation against an officer "making perjurious or recklessly false statements in support of a warrant" to arrest warrants); *see also Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019) (stating that "officers may not lie about or conceal critical information" intentionally).

Since the right was clearly established, Plaintiff must show that Defendant violated that right. The only element of malicious prosecution at issue here is constitutional firmness, so to overcome qualified immunity, Plaintiff must show that

13

Defendant "intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Mathis*, 2022 WL 16849124, at \*9 (quoting *Luke v. Gulley*, 50 F.4th 90, 95–96 (11th Cir. 2022)).

The Court applies a two-part test to determine if Plaintiff has made this showing. *Id.* at 9. "First, [the Court] consider[s] 'whether there was an intentional or reckless misstatement or omission.'" *Id.* (quoting *Paez*, 915 F.3d at 1287). Second, the Court "examine[s] the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed or the omitted information included." *Id.* (quoting *Paez*, 915 F.3d at 1287). If the affidavit would have demonstrated arguable probable cause with the misstated information corrected, then Defendant gets qualified immunity and escapes liability. *Id.* (quoting *Paez*, 915 F.3d at 1288).

The Court starts with whether Defendant made an intentional or reckless misstatement. Plaintiff "must identify affirmative evidence from which a jury could find that [Defendant] lied" in his affidavit. *Williams*, 965 F.3d at 1165 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998)). "General attacks upon a defendant's credibility are not enough to meet this burden." *Williams*, 965 F.3d at 1165 (quoting *Crawford-El*, 523 U.S. at 600) (cleaned up). Neither are conclusory allegations or speculation. *Id.* at 1166. Furthermore, "generally, inadmissible hearsay cannot be considered on a motion for summary judgment." *Blash v. City of Hawkinsville*, 856 F. App'x 259, 261 n.2 (11th Cir. 2021) (citing *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012)). But, "a

14

district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* (citing *Jones,* 683 F.3d at 1293–1294).

Here, a jury must ultimately determine Defendant's state of mind. Defendant conducted the interviews with Plaintiff, so he was present when Plaintiff denied that his brother was in a gang. [Doc. 28-1, Exhibit 1 Daniely Interview, p. 47:2–7]. Defendant also conducted the Facebook search and had firsthand knowledge of the content of Plaintiff's Facebook messages with his brother. [Doc. 28-1, ¶ 11]. Furthermore, the DA's office repeatedly asked Defendant to turn over the footage from Plaintiff's first interview, but Defendant did not. [Wilson Depo, pp. 23:19–25:21]. To ultimately acquire the video, the DA's office had to escalate its request to Defendant's supervisors. [*Id.* at 23:19–24:6]. When asked to produce the video, Defendant told ADA Wilson that he didn't want Plaintiff to be an officer anymore, and encouraged Wilson to make a plea offer that only included a probation sentence rather than prison.[5] [*Id.* at 25:11–14]. These facts are sufficient to create a triable issue of fact for the jury as to whether Defendant intentionally or recklessly made the inaccurate statements that lead to Plaintiff's arrest or whether he just made a mistake. *See Williams*, 965 F.3d 1165–1166.

---

[5] Wilson's statements about what Defendant said do not violate Federal Rule of Evidence 602, as Defendant argues, because Defendant made the statements to ADA Wilson. [Doc. 37, pp. 5–6]; [Wilson Depo., p. 25:11–15]. Furthermore, Wilson's statements about what Defendant said are not hearsay under Federal Rule of Evidence 801(d)(2), so the Court can consider them at this time.

15

For materiality, Plaintiff argues that Defendant's false statements in the arrest affidavit were material because the affidavit does not establish probable cause without them. [Doc. 34, pp. 3–8]; *see also Mathis*, 2022 WL 16849124, at *9 (courts examine materiality by "inquiring whether probable cause would be negated if the offending statement was removed or the omitted information included.") (quoting *Paez,* 915 F.3d at 1287). Before getting there, though, the Court must determine the false statements in Defendant's affidavit.

Plaintiff asserts that Defendant made four false statements in his affidavit: (1) Plaintiff provided a gun to his brother, (2) the gun was a rifle because "rod" has a specific meaning, (3) Plaintiff admitted to Defendant in an interview that he knew his brother was a member of 4KG Crip, and (4) all the above information was discovered through a Social Media Search Warrant. [Doc. 34, p. 4]. Of those assertions, the parties agree that (3) was false. [*Id.*]; [Doc. 26-1, p. 13]; [Doc. 28-1, ¶ 14]. Plaintiff did not, in fact, admit that his brother was a 4KG Crip. Instead, Plaintiff expressly denied that his brother was involved in a gang. [Doc. 28-1, Exhibit 1 Daniely Interview, p. 47:6–11].

The Court also agrees with Plaintiff that statement (1) was false. In his affidavit, Defendant stated that Plaintiff "did knowingly provide a 'rod' . . . to Jayshawn Daniely." [Doc. 34-4, p. 83]. But, the facts known to Defendant at the time he made his affidavit did not support this statement. Defendant found Facebook messages between Plaintiff and his brother. [Doc. 28-1, ¶ 11]. In those messages, Plaintiff's brother told him

16

"I was finna ask you too put dis rod in yo name for me." [Doc. 30-1, p. 269]. Plaintiff responded with "You got the money[?]" [*Id.*]. His brother responded affirmatively, so Plaintiff said "Do it tomorrow[.]" [*Id.*]. Two months later, Plaintiff's brother told him to "Take da rod too my ma house in da morning[.]" [*Id.* at p. 270]. Later that day, Plaintiff's brother asked "Wea it at[?]" [*Id.*]. While these messages likely supported several inferences in Defendant's mind,[6] they did not and cannot support the statement that Plaintiff "did . . . provide" his brother with a gun. [Doc. 34-4, p. 83]. There is nothing else in the record from before Defendant gave his affidavit of arrest that could support such a statement, either. *See* [Wilson Depo., p. 53:21–23].

As for the other statements, the Court cannot determine whether statement (2) is false from the current record, and Plaintiff did not argue how (4) is allegedly false. Concerning Statement (2), whether a "rod" is a handgun or rifle isn't likely material because providing either type of firearm would likely have sufficed to support the warrant. Again, because statement (1) is false, there is no evidence of Plaintiff actually giving his brother any firearm. Plaintiff asserts that "rod" means a rifle, but Defendant asserts that "rod" just means "gun" in this context because that is what Plaintiff and his

---

[6] Defendant's arguments in his Reply also don't distinguish between inferences and direct evidence. Defendant argues that he "gathered clear-cut evidence of a plan for Plaintiff to purchase a gun in Plaintiff's name for his younger brother." [Doc. 37, p. 3]. He states that "[a]lthough Plaintiff denies going through with the plan now, his messages never reflect any reluctance – only willingness and planning." [*Id.*]. The Court is not here to decide whether Defendant's assertions here are true. But, the Court can say that arguing about Plaintiff's "willingness and planning" does not directly support a statement that Defendant actually purchased and gave a gun to his brother. Attempting a crime isn't the same as committing the crime. And, Defendant's affidavit clearly accused Plaintiff of committing the crime.

brother knew it to mean. [Doc. 34, p. 5]; [Doc. 37, p. 4]. The definition is clearly

disputed. Regardless, the inquiry into whether the false statements were material is not

heavily impacted by leaving in statements (2) and (4), as shown below.

> Removing the false statements, Defendant's affidavit would now read:

> The accused Ken Drell [sic] Daniely did commit the offense of Violation of Oath by a Public Officer when he being a sworn Employee of the Bibb County Sheriff Office located at 668 Oglethorpe St in Macon, Georgia did [removed] in which this Investigator knows to be a rifle [removed]. [Removed]. This Investigator knows FourKG Crip to be a Violent Hybrid Crip Street Gang in Macon Georgia. In doing so Daniely directly violated his signed Oath of Office and clearly displayed he was an Associate of the Criminal Organization FourKG Crip. All of the above information was discovered through a Social Media Search Warrant obtained and reviewed on the 20th day of December 2022. and this deponent makes this affidavit that a warrant issue for his (her) arrest.

[Doc. 34-4, p. 83]; *see also* [Doc. 24-4, p. 85]. With statements (1) and (3) removed,

Defendant's affidavit merely consists of statements of his own knowledge. None of the

remaining statements refer to Plaintiff's actions, so the affidavit would lack sufficient

information for a reasonable officer to conclude that Plaintiff committed an alleged

crime. *See Williams*, 965 F.3d at 1167 ("an affidavit does not support probable cause if it

lacks any facts that suggest a crime occurred."); *see also Washington v. Howard*, 25 F.4th

891, 902 (11th Cir. 2022) ("We conclude that the correct legal standard to evaluate

whether an officer had probable cause to seize a suspect is to ask whether a reasonable

officer could conclude that there was a substantial chance of criminal activity.")

(internal quotations omitted) (cleaned up). As a result, Defendant's false statements

18

were material because the affidavit cannot support probable cause without them.

Defendant argues that the Eleventh Circuit should allow courts to consider inculpatory evidence known to the officer but left out of the officer's affidavit in a materiality analysis. [Doc. 26-1, p. 14]. Defendant's argument simply is not fleshed out enough to overcome existing case law. In total, Defendant devotes one and one-half pages to adopting a position that the Eleventh Circuit has yet to adopt. [*Id.* at pp. 14–16]. He does not cite to caselaw from other circuits, and he limits his Eleventh Circuit law to a single concurring opinion.

Nevertheless, the Court briefly addresses Defendant's argument. He says that in allowing extrinsic inculpatory evidence, the Eleventh Circuit would be joining the Fifth and Second Circuits, but he does not point to any Fifth or Second Circuit cases in his Motion or Reply. [Doc. 26-1, pp. 14–16]; [Doc. 37]. Defendant cited the concurrence in *Butler*, 85 F.4th at 1120 (Carnes, J., concurring), which does contain citations to the Fifth and Second Circuits. There, Judge Carnes stated that *Butler* did not decide whether a court should consider undisclosed inculpatory evidence in a materiality analysis. *Id.*

But, one year later, the Eleventh Circuit decided *Sylvester*. 94 F.4th 1324. There, the Court held that

> it is no response to [the plaintiff's] malicious prosecution claim that [the investigating officer] could have, but did not, present inculpatory evidence in the affidavit that established probable cause for an arrest. Under our caselaw, [the investigating officer] cannot now rehabilitate his affidavit by

19

resorting to evidence that he never relayed to the state judge.[7]

*Id.* at 1330. To be clear, this was also the law in the Eleventh Circuit at the time of the events underlying this lawsuit, although not as succinctly articulated. *See, e.g., Luke,* 50 F.4th at 96 ("And we do not consider in the calculus of probable cause that the detective relied on the investigative file and his intuition to identify Luke as a suspect because no record exists that he submitted the file to or explained his thought process to the magistrate judge."); *Mathis,* 2022 WL 1689124, at *8 ("For a malicious prosecution claim, the determination of probable cause turns on 'what the affidavit charging the plaintiff stated.") (quoting *Williams,* 965 F.3d at 1163). It was also the law immediately after the events underlying this lawsuit. *See Land v. Sheriff of Jackson Cnty. Fla.,* 85 F.4th 1121, 1127 (11th Cir. 2023) ("We do not consider the subjective knowledge of the arresting officer, later amendments not presented to a magistrate judge, or any evidence not incorporated into the operative affidavit."). In sum, the law in the Eleventh Circuit is sufficiently well-established for the Court to reject Defendant's argument. Defendant may not save his affidavit through extrinsic inculpatory statements.

Therefore, Plaintiff has met his burden. Defendant's state of mind when he made the statements in his affidavit is a triable issue of fact appropriate for a jury, and Defendant's false statements were material. Since constitutional infirmness is the only element of a malicious prosecution case at issue here, Plaintiff has shown all he needs to

---

[7] Defendant acknowledges that *Sylvester* is counter to his argument. [Doc. 26-1, p. 15].

show. "Because [Plaintiff] has established a genuine dispute over whether the officers violated his clearly established rights under the Fourth Amendment, [Defendant is] not entitled to qualified immunity at this stage of the suit."[8] *Williams*, 965 F.3d at 1169. Furthermore, Plaintiff has established a genuine issue as to Defendant's intent for Plaintiff's malicious prosecution claim.

### D.   CONCLUSION

Accordingly, summary judgment in favor of Defendant is not appropriate on Plaintiff's federal malicious prosecution claim, and the Court **DENIES** Defendant's Motion for Summary Judgment [Doc. 26]. Since Plaintiff voluntarily dismissed his state law claims, Counts one, two, and three of Plaintiff's Complaint are **DISMISSED**. [Doc. 23, p. 18]. The case will continue to trial on Plaintiff's federal malicious prosecution claim (Count four) only. The Court will issue an order shortly setting the relevant dates for trial.

**SO ORDERED**, this 16th day of March, 2026.

S/ *Tilman E. Self, III*
**TILMAN E. SELF, III**
**UNITED STATES DISTRICT JUDGE**

---

[8] Plaintiff argued that qualified immunity is unconstitutional. [Doc. 34, pp. 15–18]. Since Defendant is not entitled to qualified immunity at this stage of the lawsuit, Plaintiff's argument is moot.